IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

*In re:*
                                                CASE NO. 6:19-BK-05155-KSJ
                                                CHAPTER 7

DIEGO L OSPINA,

        Debtors.

_____/

**MOTION FOR RELIEF FROM AUTOMATIC STAY**
**NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING**

**Pursuant to Local Rule 2002-4, the Court will consider the relief requested in this paper without further notice or hearing unless a party in interest files a response within 21 days from the date set forth on the attached proof of service, plus an additional three days for service if any party was served by U.S. Mail. You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated.**

**If you object to the relief requested in this paper, you must file a response with the Clerk of the Court at 400 W. Washington Street, Suite 5100, Orlando, FL 32801  and serve a copy on the movant's attorney, Howard Law Group, 4755 Technology Way, Suite 104, Boca Raton, FL 33431, and any other appropriate persons within the time allowed. If you file and serve a response within the time permitted, the Court will either schedule and notify you of a hearing or consider the response and grant or deny the relief requested without a hearing.**

**If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, will proceed to consider the paper without further notice or hearing, and may grant the relief requested.**

        U.S. Bank Trust National Association as Trustee of the Chalet Series IV Trust ("Movant")

hereby moves this Court, pursuant to 11 U.S.C. § 362, for relief from the automatic stay with respect to

certain real property of the Debtor(s) having an address of 205 ROBIN LEE ROAD, OVIEDO, FL

32765 (the "Property").   The facts and circumstances supporting this Motion are set forth in the

Affidavit in Support of Motion for Relief from Automatic Stay (the "Affidavit"), attached hereto as

Exhibit E.  In further support of this Motion, Movant respectfully states:

1.      A petition under Chapter 13 of the United States Bankruptcy Code was filed with respect to the

Debtor(s) on June 1, 2018, and was later converted to a case under Chapter 7 on August 6, 2019.

2.      The Debtor(s) has/have executed and delivered or is/are otherwise obligated with respect to that

certain promissory note in the original principal amount of $389,816.07 (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit A.  Movant is an entity entitled to enforce the Note.

3.    Pursuant to that certain Mortgage (the "Mortgage"), all obligations (collectively, the "Obligations") of the Debtor(s) under and with respect to the Note and the Mortgage are secured by the Property.  A true and correct copy of the Mortgage is attached hereto as Exhibit B.

4.    All rights and remedies under the Mortgage have been assigned to the Movant pursuant to that certain assignment of mortgage, a true and correct copy of which is attached hereto as Exhibit C.

5.    The legal description of the Property is

LOT 20, BLOCK A, SUBDIVISION ROANN ESTATES, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 19, PAGE 22, OF THE PUBLIC RECORDS OF SEMINOLE COUNTY, FLORIDA.

6.    As of the petition date, the outstanding unpaid principal balance under the Note was 287,718.42, and the Debtor has defaulted under the terms of the Note and Mortgage by failing to make the payment due on July 21, 2018.

7.    In addition to the other amounts due to Movant reflected in this Motion, as of the date hereof, in connection with seeking the relief requested in this Motion, Movant has also incurred $850.00 in legal fees and $181.00 in costs.

8.    The estimated market value of the Property is $233,130.00. The basis for such valuation is Seminole County Property Appraiser.  A copy of the valuation is attached hereto as Exhibit D.

9.    Upon information and belief, the aggregate amount of encumbrances on the Property listed in the Schedules or otherwise known, including but not limited to the encumbrances granted to Movant, is $334,748.41.

10.    Secured Creditor requests that all communications sent by Secured Creditor in connection with proceeding against the property including, but not limited to, notices required by state law and

communications to offer and provide information with regard to a potential Forbearance Agreement, Loan Modification, Refinance Agreement, Loss Mitigation Agreement, or other Loan Workout, may be sent directly to Debtor.

11.  Cause exists for relief from the automatic stay for the following reasons:

    (a)  Movant`s interest in the Property is not adequately protected.

    (b)  Pursuant to 11 U.S.C. § 362(d)(2)(A), Debtor(s) has/have no equity in the Property.

12.  Pursuant to 11 U.S.C. § 362(e), Movant requests that in the event a hearing is necessary, said hearing be held within thirty (30) days.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.  Relief from the stay allowing Movant (and any successors or assigns) to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

2.  That the Order be binding and effective despite any conversion of this bankruptcy case to a case under any other chapter of Title 11 of the United States Code.

3.  That the 14-day stay pursuant to FRBP 4001 be waived.

4.  For such other relief as the Court deems proper.

Respectfully submitted,
HOWARD LAW GROUP

/s/ Matthew Klein
MATTHEW KLEIN
FLORIDA BAR#: 73529
4755 Technology Way, Suite 104
Boca Raton, FL 33431
Telephone: 954-893-7874
Fax: 888-235-0017
Email: matthew@howardlawfl.com

**I HEREBY CERTIFY** that on November 7, 2019, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System, which will send a notice of electronic filing to all CM/ECF participants:

Kenneth D. Herron, Jr., Esq., 135 West Central Boulevard, Suite 480, Orlando, FL 32801

Carla P. Musselman, 1619 Druid Road, Maitland, FL 32751

Office of the US Trustee, 400 West Washington Street, Suite 1100, Orlando, FL 32801

and a true and correct copy was mailed to the non-CM/ECF participant:

Diego L. Ospina, 205 Robin Lee Road, Oviedo, FL 32765

/s/ Matthew Klein
MATTHEW KLEIN
FLORIDA BAR#: 73529

# EXHIBIT A

## ADJUSTABLE RATE NOTE

**NOTICE TO BORROWER: THIS NOTE CONTAINS A PROVISION ALLOWING FOR CHANGES IN THE INTEREST RATE. INCREASES IN THE INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.**

| 11/16/05 | ORLANDO, FL 32828 |
|---|---|
| [Date] | [City, State, Zip] |

205 ROBIN LEE RD
OVIEDO, FL 32765
[Property Address]

**1.     BORROWER'S PROMISE TO PAY**

To repay my loan, I promise to pay U.S. $389816.07 _____ (this amount is called the Amount Financed) together with Interest at the Rate of Interest Per Year until fully paid plus Points, to the order of Lender. The Lender is Wells Fargo Financial System Florida, Inc. I'll pay this sum in instalments each month according to the terms of repayment below. The final instalment is equal to the unpaid Amount Financed plus any unpaid Points and Interest. Each payment will be applied first to the Interest due on the date of payment, then to any Points pro rata, then to the Amount Financed. I can prepay my loan any time. The Unpaid Balance of my loan is equal to the Amount Financed plus any Points. Any Points are not a "prepaid finance charge" under the federal Truth-in-Lending Act. Interest is computed on the Amount Financed. The Rate of Finance Charge Per Year on my loan is the Annual Percentage Rate. I understand that Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.     INTEREST**

I will pay interest at a yearly rate of _____ 7.38 %. The interest rate I will pay will change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(A) of this Note. Interest will be calculated on an interest-bearing basis.

**3.     PAYMENTS**

**(A)     Scheduled Payments**

I will pay principal and interest by making payments when scheduled. I will make my scheduled payments each month beginning on _____ 12/21/05 _____.

**(B)     Maturity Date and Place of Payments**

I will make these payments as scheduled until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.

My scheduled payments will be applied to interest before principal. If, on _____ 11/21/35 _____, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my scheduled payments at 12780 WATERFORD LAKES,120 _____ ORLANDO, FL 32828 _____ or at a different place if required by the Note Holder.

**(C)     Amount of My Initial Scheduled Payments**

Each of my initial scheduled payments will be in the amount of U.S. $2737.00 _____. This amount may change.

**(D)     Scheduled Payment Changes**

Changes in my scheduled payments will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my scheduled payment in accordance with Section 4 of this Note.

ORIGINAL

4.    INTEREST RATE AND SCHEDULED PAYMENT CHANGES
    (A)    Change Dates
        Each date on which my interest rate could change is called a "Change Date." The interest rate I will pay may change on _____11/21/08_____ and on every sixth month anniversary date thereafter that is before the maturity date. There will be no Change Dates on or after the maturity date. The interest rate in effect on the maturity date will remain in effect after the maturity date until the full amount of principal has been paid.
    (B)    The Index
        Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the highest "Prime Rate" as published by the *The Wall Street Journal.*
        The most recent month-end (defined as the last business day of that month) Index available before the date occurring one day preceding one month prior to the Change Date is called the "Current Index." For example, if your Change Date is May 13, the most recent month-end Index available on April 12 (one day preceding one month prior to May 13) would be the Index for March 31, assuming March 31 is a business day. If your Change Date is July 1, the most recent month-end Index available on May 31 would be the Index for April 30, assuming April 30 is a business day.
        If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
    (C)    Calculation of Changes
        Before each Change Date, the Note Holder will calculate my new interest rate by adding _____00.63_ % (this number is referred to as the "Margin") to the Current Index. The result of this calculation will be rounded off by the Note Holder to the nearest 0.125%. Subject to the limitations stated in Section 4(D) below, this amount will be my new interest rate until the next Change Date.
        The Note Holder will then determine the amount of the scheduled payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my scheduled payment.
    (D)    Limits on Interest Rate Changes
        My interest rate will never be increased or decreased on the first Change Date by more than three (3%) percentage points. For all Change Dates thereafter, my interest rate will never be increased or decreased by more than one (1%) percentage point. Subject to any limitation set forth in Section 6 below, my interest rate will never be more than six (6%) percentage points greater than the initial interest rate set forth in Section 2 above. Notwithstanding anything to the contrary in this Note, my interest rate will never decrease below 3.5%.
    (E)    Effective Date of Changes
        My new interest rate will become effective on each Change Date. I will pay the amount of my new scheduled payment beginning on the first scheduled payment date after the Change Date until the amount of my scheduled payment changes again.
    (F)    Notice of Changes
        At least 25 days, but no more than 120 days, before the effective date of any payment change, the Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my scheduled payment. The notice will include information required by law to be given to me and also the telephone number of a person who will answer any question I may have regarding the notice.

5.    PREPAYMENT
        If the Loan Statement indicates that a prepayment penalty may be charged and if I prepay my loan in whole for any reason (including after a default) within 3 years from the date on which the Mortgage which secures my loan was signed, Note Holder may charge a prepayment charge equal to 3% of the original principal balance of this loan if the loan is prepaid during the first year of the loan, 2% of the original principal balance if the loan is prepaid during the second year of the loan and 1% of the original principal balance if the loan is prepaid during the third year of the loan. The prepayment penalty described in this paragraph will be waived if: (a) my loan is prepaid by a loan made by Note Holder or a non-brokered loan by one of Note Holder's affiliates, more than 12 months after the date of this Note; or, (b) as required by applicable state or federal law or regulation.

6.    LOAN CHARGES
        If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the



principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment. It is agreed that the total of the Interest, Points and Prepayment Charge payable by me on my loan shall in no event exceed the equivalent of 18% per year simple interest computed in accordance with F.S. Chapter 687. Therefore, if I prepay my loan, if necessary Lender will first reduce, waive or refund any Prepayment Charge, and then if still necessary any Points, in the amount required so that Lender's yield on this Note does not exceed the equivalent of 18% per year simple interest.

This loan and Note are governed by the laws of Florida. This loan is made under F.S. Chapter 687. Wells Fargo Financial System Florida, Inc., Wells Fargo Financial Credit Services Florida, Inc., and Centurion Life Insurance Company are affiliated companies, are all owned by a common holding company and may have common officers and directors. Therefore, if I borrow or purchase products or services from any of these companies, Wells Fargo Financial System Florida, Inc., may receive a financial benefit.

### 7.    BORROWER'S FAILURE TO PAY AS REQUIRED
    **(A)    Default**
    If I do not pay the full amount of each scheduled payment on the date it is due, I will be in default.
    **(B)    Notice of Default**
    If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.
    **(C)    No Waiver By Note Holder**
    Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full or does not exercise the right of set-off as described above, the Note Holder will still have the right to do so if I am in default at a later time.
    **(D)    Payment of Note Holder's Costs and Expenses**
    If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8.    GIVING OF NOTICES
    Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.
    Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(B) above or at a different address if I am given a notice of that different address.

### 9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE
    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10.    WAIVERS
    I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11.    SECURED NOTE
    In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as the Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate

ORIGINAL

payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**I am not required to purchase additional products or services from any person or entity suggested or recommended by Wells Fargo Financial System Florida, Inc. However, Wells Fargo Financial System Florida, Inc., hereby reserves the right to approve the entity selected by the borrower, which approval may not be unreasonably withheld.**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Borrower

_____ (Seal)

DIEGO OSPINA
Borrower

_____ (Seal)

THE PROPER AMOUNT OF DOCUMENTARY
STAMPS IN THE AMOUNT OF $_____
HAVE BEEN PLACED ON THE MORTGAGE
WHICH SECURES THIS NOTE.

Borrower

_____ (Seal)

Borrower

_____ (Seal)

*[Sign Original Only]*



Without Recourse
Pay to the Order of _____,
Wells Fargo Financial System Florida, Inc.

By: _Luke W Reimers_
Luke W. Reimers, Vice President

0001

Without Recourse
Pay to the order of

Wells Fargo Financial, Inc. its successor by merger to
Wells Fargo Financial Florida, Inc. its successor by
merger to Wells Fargo Financial System Florida, Inc.

Bruce A. Sutter, Vice President Loan Processor

**VOID**

**Merger did not occur**

SEP 1 1 2012   SH

0001

# EXHIBIT B

MARYANNE MORSE, CLERK OF CIRCUIT COURT
SEMINOLE COUNTY
BK 06025 PGS 1511-1523
CLERK'S # 2005209835
RECORDED 12/06/2005 11:37:08 AM
MTG DOC TAX 1,419.25
INTANG TAX 810.82
RECORDING FEES 112.00
RECORDED BY D Thomas

Prepared by: Wells Fargo Financial, Inc.
604 Locust
Des Moines, Iowa 50309

Return to:  WELLS FARGO FINANCIAL SYSTEM FLORIDA, INC.
12780 WATERFORD LAKES,120
ORLANDO, FL 32828

## MORTGAGE

Total of Payments $ 985320.00          Number of Monthly Installments _____ 360 _____

Amount Financed $ 389816.07          Final Installment Due Date ___ 11/21/35 ___

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 9, 11, 16, 18 and 19. Certain rules regarding the usage of words used in this document are also provided in Section 14.

**(A)**  "**Security Instrument**" means this document, which is dated _____ 11/16/05 _____, together with all Riders to this document.

**(B)**  "**Borrower**" is DIEGO OSPINA AND CATHERINE OSPINA, HUSBAND AND WIFE
_____

Borrower is the mortgagor under this Security Instrument.

**(C)**  "**Lender**" is Wells Fargo Financial System Florida, Inc. Lender is a corporation organized and existing under the laws of Florida. Lender's address is_____ 12780 WATERFORD LAKES,120 ORLANDO, FL 32828 _____. Lender is the mortgagee under this Security Instrument.

**(D)**  "**Note**" means the promissory note signed by Borrower and dated _____ 11/16/05 _____. The Note states that Borrower owes Lender $405408.71 _____ (U.S. Dollars) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than _____ 11/21/35 _____.

**(E)**  "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

**(F)**  "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(G)**  "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider    [ ] Condominium Rider    [ ] Second Home Rider
[ ] Balloon Rider    [ ] Planned Unit Development Rider    [ ] Other(s) [specify] _____
[ ] 1-4 Family Rider    [ ] Biweekly Payment Rider

**(H)**  "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(I)**  "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(J)**  "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic

instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K)** **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 4) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(L)** **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(M)** **"Periodic Payment"** means the regularly scheduled amount due for principal and interest under the Note.

**(N)** **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(O)** **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, the following described property located in the _____ COUNTY _____ of _____ SEMINOLE _____ :
      [Type of Recording Jurisdiction]      [Name of Recording Jurisdiction]

**The Description of the Property is attached hereto as "Addendum A to Mortgage - Description of Property," and is specifically incorporated herein.**

which currently has the address of _____ 205 ROBIN LEE RD _____
                                           [Street]

_____ OVIEDO _____ , Florida _____ 32765 _____ ("Property Address"):
        [City]                           [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1.** **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may



require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

    **2.    Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) fees and charges due under the Note; (b) interest due under the Note; and (c) principal due under the Note. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.    Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.

    Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 3.

    Lender may require Borrower to pay a one-time charge for real estate tax verification and/or reporting service used by Lender in connection with this Loan.

    **4.    Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

    If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 4 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 20 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

5.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

6.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 4 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

7.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

8.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and

rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying Reasonable Attorneys' Fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

9.    **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 17, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material

impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

10.    **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

11.    **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 16, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 18) and benefit the successors and assigns of Lender.

12.    **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

13.    **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



14.    **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

15.    **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

16.    **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 16, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 13 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

17.    **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, Reasonable Attorneys' Fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 16.

18.    **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the

Note purchaser.

19. **Hazardous Substances.** As used in this Section 19: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

20. **Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 16 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 20, including but not limited to, Reasonable Attorneys' Fees and costs of title evidence.**

21. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

22. **Attorneys' Fees.** As used in this Security Instrument and the Note, attorneys' fees shall include those awarded by an appellate court and any attorneys' fees incurred in a bankruptcy proceeding.

23. **Jury Trial Waiver.** The Borrower hereby waives any right to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
Borrower
DIEGO OSPINA

_____ (Seal)
Borrower
CATHERINE OSPINA

_____ (Seal)
Borrower

_____ (Seal)
Borrower

Signed, sealed and delivered in the presence of:

Witnesses:

_____
Print Name  Kevin Blandford

_____
Print Name  Michael McCarthy

-------------------- [Space Below This Line For Acknowledgment] --------------------

State of Florida
County of _____ Orange _____

The foregoing instrument was acknowledged before me this ___16th___ day of ___November, 2005___ by
DIEGO OSPINA AND CATHERINE OSPINA, HUSBAND
AND WIFE

who is personally known to me or who has produced ___Florida Drivers License___ as
identification and who did (did not) take an oath.

Melissa M. Gerena
Commission #DD204115
Expires: Apr 16, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

_____
Type Name as Signed: Melissa M. Gerena
Notary Public

My Commission Expires: ___April 16, 07___

ADDENDUM A
TO
MORTGAGE

Description of Property

LAND REFERRED TO IN THIS COMMITMENT IS DESCRIBED AS ALL THAT CERTAIN
PROPERTY SITUATED IN CITY OF OVIEDO IN THE COUNTY
OF SEMINOLE, AND STATE OF Florida
AND BEING DESCRIBED IN A DEED DATED 10/15/03 AND RECORDED 12/31/03
IN BOOK 5152 PAGE 664, AMONG THE LAND RECORDS OF THE COUNTY AND
STATE SET FORTH ABOVE, AND REFERENCED AS FOLLOWS:
LOT 20, BLOCK A, SUBDIVISION ROANN ESTATES, PLAT BOOK 19, PLAT PAGE 22
PARCEL ID: 30-21-31-502-0A00-0200

# ADJUSTABLE RATE RIDER

THIS ADJUSTABLE RATE RIDER is made on _____ 11/16/05 _____ and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to Wells Fargo Financial System Florida, Inc. (the "Lender") of the same date and covering the property described in the Security Instrument and located at: _____ 205 ROBIN LEE RD _____

OVIEDO, FL 32765
[Property Address]

> **NOTICE: THE SECURITY INSTRUMENT SECURES A NOTE WHICH CONTAINS A PROVISION ALLOWING FOR CHANGES IN THE INTEREST RATE. INCREASES IN THE INTEREST RATE WILL RESULT IN HIGHER PAYMENTS. DECREASES IN THE INTEREST RATE WILL RESULT IN LOWER PAYMENTS. THE NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower (hereinafter "I," and "me") and Lender (hereinafter "Note Holder") further covenant and agree as follows:

1. **INTEREST RATE AND PERIODIC PAYMENT CHANGES**
   The Note provides for an initial interest rate as well as for changes in the interest rate and the payments.

2. **PAYMENTS**
   **(A)    Scheduled Payments**
   I will pay principal and interest by making payments when scheduled. I will make my scheduled payments each month as required under the Note.
   **(B)    Maturity Date and Place of Payments**
   I will make these payments as scheduled until I have paid all of the principal and interest and any other amounts described below that I may owe under the Note.
   My scheduled payments will be applied to interest before principal. If, on the Maturity Date set forth in the Note I still owe amounts under the Note, I will pay those amounts in full on the "maturity date."
   I will make my scheduled payments at or to the place(s) specified by the Note, or at a different place if required by the Note Holder.
   **(C)    Amount of My Initial Scheduled Payments**
   Each of my initial scheduled payments will be in the amount as specified in the Note. This amount may change as provided in the Note.
   **(D)    Scheduled Payment Changes**
   Changes in my scheduled payments will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my scheduled payment in accordance with the Note.



3.    INTEREST RATE AND SCHEDULED PAYMENT CHANGES
      (A)    Change Dates
      Each date on which my interest rate could change is called a "Change Date." The interest rate I will pay may change on the Change Date specified in the Note, and on every sixth month anniversary date thereafter that is before the maturity date. There will be no Change Dates on or after the maturity date. The interest rate in effect on the maturity date will remain in effect after the maturity date until the full amount of principal has been paid.
      (B)    The Index
      Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the highest "Prime Rate" as published by the *The Wall Street Journal*.
      The most recent month-end (defined as the last business day of that month) Index available before the date occurring one day preceding one month prior to the Change Date is called the "Current Index." For example, if your Change Date is May 13, the most recent month-end Index available on April 12 (one day preceding one month prior to May 13) would be the Index for March 31, assuming March 31 is a business day. If your Change Date is July 1, the most recent month-end Index available on May 31 would be the Index for April 30, assuming April 30 is a business day.
      If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.
      (C)    Calculation of Changes
      Before each Change Date, the Note Holder will calculate my new interest rate by adding the Margin specified in the Note to the Current Index. The result of this calculation will be rounded off by the Note Holder to the nearest 0.125%. Subject to the limitations stated in Section 3(D) below, this amount will be my new interest rate until the next Change Date.
      The Note Holder will then determine the amount of the scheduled payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my scheduled payment.
      (D)    Limits on Interest Rate Changes
      My interest rate will never be increased or decreased on the first Change Date by more than three (3%) percentage points. For all Change Dates thereafter, my interest rate will never be increased or decreased by more than one (1%) percentage point. Subject to any limitation set forth in Section 6 of the Note, my interest rate will never be more than six (6%) percentage points greater than the initial interest rate set forth in the Note. Notwithstanding anything to the contrary in the Note, my interest rate will never decrease below 3.5%.
      (E)    Effective Date of Changes
      My new interest rate will become effective on each Change Date. I will pay the amount of my new scheduled payment beginning on the first scheduled payment date after the Change Date until the amount of my scheduled payment changes again.
      (F)    Notice of Changes
      At least 25 days, but no more than 120 days, before the effective date of any payment change, the Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my scheduled payment. The notice will include information required by law to be given to me and also the telephone number of a person who will answer any question I may have regarding the notice.

[X]    FUNDS FOR TAXES AND INSURANCE .
      Uniform Covenant 2 of the Security Instrument is waived by the Lender.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

Borrower

_____ (Seal)
DIEGO OSPINA

Borrower

_____ (Seal)
CATHERINE OSPINA

Borrower

_____ (Seal)

Borrower

_____ (Seal)

Grant Maloy, Clerk Of The Circuit Court & Comptroller Seminole County, FL
Inst #2019 54894 Book 9375 Page 0155 (3 PAGES) Doc 1829/2019 13
REC FEE $10.00  INDEX FEE $1.00

Case 6:12-bk-05155-KSJ   Doc 134   Filed 11/07/19   Page 23 of 31

# COMPOSITE
# EXHIBIT C

RECORDING REQUESTED BY:
WELLS FARGO BANK, N.A.
1000 BLUE GENTIAN RD
EAGAN MN 55121
WHEN RECORDED MAIL TO:
WELLS FARGO BANK, N.A.
1000 BLUE GENTIAN RD #200
MAC:
EAGAN, MN 55121-4400
ATTN: ASSIGNMENT TEAM

### ASSIGNMENT OF MORTGAGE

For good and valuable consideration, the sufficiency of which is hereby acknowledged, **WELLS FARGO USA HOLDINGS, INCORPORATED, SUCCESSOR BY MERGER TO WELLS FARGO FINANCIAL SYSTEM FLORIDA, INCORPORATED , 800 WALNUT ST , DES MOINES, IA 50309** , by these presents does convey, assign, transfer and set over to: **MTGLQ INVESTORS, L.P. , 2001 ROSS AVENUE SUITE 2800, DALLAS, TX 75201** , the described Mortgage, with all interest, all liens, and any rights due or to become due thereon. Said Mortgage for **$405408.71** is recorded in the State of **FLORIDA** , County of Seminole Official Records, dated **11/16/2005** and recorded on **12/06/2005** , as Instrument No. **2005209835** in Book No. **06025** , at Page No. **1511**
Original Mortgagor: **DIEGO OSPINA AND CATHERINE OSPINS, HUSBAND AND WIFE**
Original Mortgagee: **WELLS FARGO FINANCIAL SYSTEM FLORIDA, INC.**
Property Address: **205 ROBIN LEE RD OVIEDO, FL 32765**

Date: 06/18/2019 .
WELLS FARGO USA HOLDINGS,
INCORPORATED, SUCCESSOR BY MERGER TO
WELLS FARGO FINANCIAL SYSTEM FLORIDA,
INCORPORATED

*Juliane M Christensen*

JULIANE M CHRISTENSEN, Vice President
STATE OF MN
COUNTY OF Dakota } s.s.
On **06/18/2019** before me, **DEREJE D. BADADA** , a Notary Public, personally appeared **JULIANE M CHRISTENSEN** , Vice President of **WELLS FARGO USA HOLDINGS, INCORPORATED, SUCCESSOR BY MERGER TO WELLS FARGO FINANCIAL SYSTEM FLORIDA, INCORPORATED** personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

*Dereje D. Badada*

DEREJE D. BADADA, Notary Public
Commission #: 31049021
My Commission Expires: 01/31/2022

> DEREJE D BADADA
> NOTARY PUBLIC - MINNESOTA
> MY COMMISSION EXPIRES 1/31/22

ca487d9c

eRecord

Prepared By and Return To:
Jake Okanuma
Collateral Department
Meridian Asset Services, LLC
3201 34th Street South, Suite 310
St. Petersburg, FL 33711
(727) 497-4650

_____ Space above for Recorder's use _____

Loan No:

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, **MTGLQ INVESTORS, L.P.**, whose address is **2001 ROSS AVENUE SUITE 2800, DALLAS, TEXAS 75201**, (ASSIGNOR), does hereby grant, assign and transfer to **U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE CHALET SERIES IV TRUST**, whose address is **7114 E. STETSON DR., SUITE 250, SCOTTSDALE, ARIZONA 85251**, (ASSIGNEE), its successors, transferees and assigns forever, all beneficial interest under that certain mortgage, together with the certain note(s) described therein with all interest, all liens, and any rights due or to become due thereon.

Date of Mortgage: 11/16/2005
Original Loan Amount: $405,408.71
Executed by (Borrower(s)): **DIEGO OSPINA & CATHERINE OSPINA**
Original Lender: **WELLS FARGO FINANCIAL SYSTEM FLORIDA, INC.**
Filed of Record: In Book/Liber/Volume 06025, Page 1511
Document/Instrument No: **2005209835** in the Recording District of **SEMINOLE, FL**, Recorded on 12/6/2005.

Property more commonly described as: **205 ROBIN LEE RD, OVIEDO, FLORIDA 32765**

IN WITNESS WHEREOF, the undersigned by its duly elected officers and pursuant to proper authority of its board of directors has duly executed, sealed, acknowledged and delivered this assignment.

Date: **AUG 2 0 2019**

**MTGLQ INVESTORS, L.P.**

By: **BETSY HANSON**

Title: **VICE PRESIDENT**

Witness Name:  Karen Koval

Witness Name: Greg Fretz

> A NOTARY PUBLIC OR OTHER OFFICER COMPLETING THIS CERTIFICATE VERIFIES ONLY THE IDENTITY OF THE INDIVIDUAL WHO SIGNED THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED, AND NOT THE TRUTHFULNESS, ACCURACY, OR VALIDITY OF THAT DOCUMENT

State of      **TEXAS**
County of      **DALLAS**

On _____AUG 2 0 2019_____, before me, _____**Natalie Flowers**_____, a Notary Public, personally appeared **BETSY HANSON, VICE PRESIDENT** of/for **MTGLQ INVESTORS, L.P.**, personally known to me, or who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF PERJURY under the laws of the State of TEXAS that the foregoing paragraph is true and correct.

I further certify BETSY HANSON, signed, sealed, attested and delivered this document as a voluntary act in my presence.

Witness my hand and official seal.

(Notary Name): _____~~Greg Fretz~~_____      Natalie Flowers

My commission expires: _____NOV 2 9 2022_____

Natalie Flowers
My Commission Expires
11/29/2022
ID No. 124227602

# EXHIBIT D



**Property Record Card**

Parcel: 30-21-31-502-0A00-0200

Property Address: 205 ROBIN LEE RD OVIEDO, FL 32765

## Parcel Information

| | |
|---|---|
| Parcel | 30-21-31-502-0A00-0200 |
| Owner(s) | OSPINA, DIEGO<br>OSPINA, CATHERINE |
| Property Address | 205 ROBIN LEE RD<br>OVIEDO, FL 32765 |
| Mailing | 539 TABATHA DR<br>OSTEEN, FL 32764-9311 |
| Subdivision Name | ROANN ESTATES |
| Tax District | 01-COUNTY-TX DIST 1 |
| DOR Use Code | 01-SINGLE FAMILY |
| Exemptions | |



## Value Summary

| | 2020 Working Values | 2019 Certified Values |
|---|---|---|
| Valuation Method | Cost/Market | Cost/Market |
| Number of Buildings | 1 | 1 |
| Depreciated Bldg Value | $159,186 | $156,390 |
| Depreciated EXFT Value | $2,720 | $2,740 |
| Land Value (Market) | $74,000 | $74,000 |
| Land Value Ag | | |
| Just/Market Value ** | $235,906 | $233,130 |
| Portability Adj | | |
| Save Our Homes Adj | $0 | $0 |
| Amendment 1 Adj | $0 | $0 |
| P&G Adj | $0 | $0 |
| Assessed Value | $235,906 | $233,130 |

| | |
|---|---|
| Tax Amount without SOH: | $3,292.99 |
| 2019 Tax Bill Amount | $3,292.99 |
| Save Our Homes Savings: | $0.00 |

* Does NOT INCLUDE Non-Ad Valorem Assessments

## Legal Description

LOT 20 BLK A
ROANN ESTATES
PB 19 PGS 22 + 23

## Taxes

| Taxing Authority | Assessment Value | Exempt Values | Taxable Value |
|---|---|---|---|
| COUNTY BONDS | $235,906 | $0 | $235,906 |
| ROAD DISTRICT | $235,906 | $0 | $235,906 |
| SJWM(Saint Johns Water Management) | $235,906 | $0 | $235,906 |
| FIRE | $235,906 | $0 | $235,906 |
| COUNTY GENERAL FUND | $235,906 | $0 | $235,906 |
| Schools | $235,906 | $0 | $235,906 |

## Sales

| Description | Date | Book | Page | Amount | Qualified | Vac/Imp |
|---|---|---|---|---|---|---|
| WARRANTY DEED | 10/1/2003 | 05152 | 0664 | $240,000 | Yes | Improved |
| WARRANTY DEED | 3/1/1988 | 01943 | 1557 | $142,000 | Yes | Improved |
| WARRANTY DEED | 6/1/1987 | 01860 | 1604 | $133,900 | Yes | Improved |
| QUIT CLAIM DEED | 6/1/1982 | 01399 | 1419 | $100 | No | Vacant |
| WARRANTY DEED | 2/1/1978 | 01156 | 1668 | $400,000 | No | Vacant |
| CERTIFICATE OF TITLE | 1/1/1976 | 01109 | 0014 | $1,000 | No | Vacant |

## Land

| Method | Frontage | Depth | Units | Units Price | Land Value |
|---|---|---|---|---|---|

| LOT | | 0.00 | 0.00 | 1 | $74,000.00 | $74,000 |
|---|---|---|---|---|---|---|

## Building Information

| # | Description | Year Built Actual/Effective | Fixtures | Bed | Bath | Base Area | Total SF | Living SF | Ext Wall | Adj Value | Repl Value | Appendages |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | SINGLE FAMILY | 1987 | 9 | 3 | 2.5 | 717 | 1,937 | 1,937 | SIDING GRADE 4 | $159,186 | $185,100 | |

| Description | Area |
|---|---|
| BASE | 100.00 |
| BASE | 1120.00 |

## Permits

| Permit # | Description | Agency | Amount | CO Date | Permit Date |
|---|---|---|---|---|---|
| 09433 | ELECTRICAL - RELOCATE 200 AMP SERVICE & 100 AMP SUBPANEL | County | $2,400 | | 12/2/2009 |
| 04986 | REROOF | County | $5,000 | | 6/19/2009 |

Permit data does not originate from the Seminole County Property Appraiser's office. For details or questions concerning a permit, please contact the building department of the tax district in which the property is located.

## Extra Features

| Description | Year Built | Units | Value | New Cost |
|---|---|---|---|---|
| SHED | 4/1/2009 | 1 | $280 | $500 |
| FIREPLACE 2 | 4/1/1987 | 2 | $2,240 | $5,600 |
| PATIO 1 | 4/1/1987 | 1 | $200 | $500 |

## Zoning

| Zoning | Zoning Descriptionun | Future Land Use | FutureLandUseDescription |
|---|---|---|---|
| RC-1 | Country Homes-1Ac | SE | Suburban Estates |

## Footprint(s)

### Building 1 Page 1



Sketch by Apex Sketch

# EXHIBIT E

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDI DIVISION

*In re:*                                    CASE NO. 6:19-BK-05155-KSJ
                                            CHAPTER 7
DIEGO L OSPINA,

      Debtor.

_____/

## AFFIDAVIT AS TO INDEBTEDNESS

STATE OF ___CALIFORNIA___

COUNTY OF ___HUMBOLDT___

    **BEFORE ME** an officer authorized to take oaths this day personally appeared ___ANGELA KRISTEN VIALE___ of SN Servicing Corporation ("Servicer"), who, being first duly sworn, deposes and says:

    1.    I am authorized to sign this affidavit on behalf of Movant, U.S. Bank Trust National Association as Trustee of the Chalet Series IV Trust ("Movant").

    2.    I am a ___Bankruptcy Asset Manager___ of the Servicer, which is Movant's servicing agent for the subject loan ("the Loan").

    3.    Servicer maintains records for the Loan. As part of my job responsibilities for the Movant, I am familiar with the type of records maintained by the Servicer in connection with the Loan.

    4.    The information in this affidavit is taken from the Servicer's business records. I have personal knowledge of the Servicer's procedures for creating these records. They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by persons

with personal knowledge; (b) the records are kept in the course of the Servicer's regularly conducted business activities; and (c) it is the regular practice of the Servicer to make such records.

5.    The Servicer services the Loan encumbering the Debtor(s); property.

7.    The information contained in the Motion for Relief ("Motion") is derived from the Servicer's business records and all the Loan documents attached to the Motion as exhibits are true and accurate copies of the original documents.

8.    The business records, which I have reviewed, show that there has been a default under the Loan, as the payment contractually due for July 21, 2018 and all subsequent payments have not been made.

9.    The default has not been cured, and there are presently due and owing to the Servicer the following sums of money.

| NAME | AMOUNT |
|---|---|
| Unpaid Principal Balance | $287,718.42 |
| Interest | $15,688.85 |
| Escrow | $3,864.64 |
| Fees Assessed | $27,476.50 |
| Grand Total | $334,748.41 |

The amount due and owing to Servicer is subject to change.

10.    I certify that the foregoing is true and correct based upon my personal knowledge.

11.    Servicer has retained Howard Law Group to prosecute the Motion and is obligated

to pay a reasonable fee and reimburse costs incurred in connection with the firm's services.

**FURTHER AFFIANT SAYETH NAUGHT.**

_Angela K Vial_
Affiant

**SWORN TO** and subscribed before me this _____ day of _____ 2019, by

_____    (Name),        as        an

_____ (Title) of the Servicer. He/she [ ] is personally known to me

or [ ] produced _____ as identification.

California Please see the attached notarial certificate. Thank you.

_____
NOTARY PUBLIC
My Commission expires:
(Notary Seal)

# CALIFORNIA JURAT

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California                          )

County of  Humboldt                          )

Subscribed and sworn to (or affirmed) before me on this ___7___ day

of _November_____ , 20 _19_ , by _Angela Viale_____

_____ ,

proved to me on the basis of satisfactory evidence to be the person(s)

who appeared before me.

Michelle Norton
Comm. #2224400
Notary Public California
Humboldt County
Comm. Expires Jan. 3, 2022

(Seal)

Signature _M Norton_____

# Optional Information

Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this jurat to an unauthorized document and may prove useful to persons relying on the attached document.

Description of Attached Document

This certificate is attached to a document titled/for the purpose of

Affidavit as to Indebtedness

containing _3_ pages, and dated _11-7-19_ .



Additional Information

Method of Affiant Identification

Proved to me on the basis of satisfactory evidence:
○ form(s) of identification   ○ credible witness(es)

Notarial event is detailed in notary journal on:
Page # _107_ Entry # _13_

Notary contact: _707-476-2690_

Other
☒ Affiant(s)  ☒ Thumbprint(s)  ☐ Describe: _____

© Copyright 2007-2018 Notary Rotary, PO Box 41400, Des Moines, IA 50311-0507. All Rights Reserved.   Item Number 101884. Please contact your Authorized Reseller to purchase copies of this form.